[S. F. Nos. 15327, 15328. In Bank.—August 1, 1935.]

MELBOURNE CARTER et al., Respondents, v. J. W. SILVER TRUCKING COMPANY (a Corporation) et al., Appellants. (Two Cases.)

Hadsell, Sweet, Ingalls & Lamb, Edmund Scott and George F. Wright for Appellants.

Ford & Johnson for Respondents.

SEAWELL, J.—The three plaintiffs, Melbourne Carter, Frank E. Pinout and Henry Von Housebrock, commenced three separate actions in the Superior Court of the County of San Mateo, this state, against the defendants, J. W. Silver Trucking Company, a corporation, owner of the truck and trailer herein, and William Harris, its driver, to recover damages for personal injuries sustained by them as the result of a collision between a Buick sedan operated by one Maurice Dioze and in which said plaintiffs were occupants, and a Kleiber truck to which was attached a four-wheeled trailer. The truck and trailer as loaded weighed approximately eighteen tons. Maurice Dioze, the operator of the Buick sedan, and his companions had visited San Francisco on the evening of March 18, 1932, and were returning together in said sedan to their respective homes, having left San Francisco at about 10:30 P. M. All but one were gardeners

and residents of Menlo Park or the vicinity near by. The separate actions of the above-named plaintiffs were consolidated for the purposes of appeal and will be so treated. Maurice Dioze is not a party plaintiff to this action. It appears that he filed an action for damages sustained by reason of said collision in the Superior Court of the City and County of San Francisco. The collision which inflicted serious injuries upon two of the occupants of the Buick sedan, and painful injuries upon the other two, occurred at approximately 11 o'clock P. M. on the Bayshore highway, about two and one-half miles north of South San Francisco. Said highway contains four lanes, the westerly one being known as slow traffic lane. Defendant's truck had also left San Francisco during the evening and was on its way southerly en route to Salinas. When at a point near the top of a hill which is about two and one half miles distant from South San Francisco, which point is approached by ascending a six or seven per cent grade, defendant's truck, which was traveling in the slow lane at the rate of three miles per hour, suddenly stopped, the water pump shaft having become frozen. According to the testimony of defendant's driver, the freezing rendered the motor immovable as the pump shaft is directly connected with and controls the ignition. The driver also claimed that the air brakes were rendered useless by said freezing and the only braking equipment that was operative was the emergency brake. The truck and trailer, thus stalled on the slow drive lane, remained there from 9:15 until they were towed off some two hours or more later. On each side of the paved highway there were good dirt shoulders twenty feet in width. The driver of the truck testified that it would have been unsafe to have undertaken to back the truck and trailer off the paved portion of the highway onto the shoulder as it was likely that the emergency brake alone was not sufficient to hold the truck and its load, and the air brakes could not be worked owing to the impaired state of the motor. A Spanish boy, whose name the driver was not able to give, was acting as a "lumper" or helper on the trip. This helper did not appear at the trial and Mr. Harris testified that he was not then in the employ of the trucking company and he did not know of his whereabouts at the time of trial. Dioze, the driver of the sedan, and Housebrock, who sat by his side on the front seat, and who were the least injured, were the

only occupants of the sedan able to give any account of the collision at the moment of the impact, or to recount the journey starting at the point where they entered the sedan in San Francisco on the return trip. Carter and Pinout were severely and painfully injured and were unconscious immediately after the impact. One of them did not regain consciousness for a period of ten or twelve days, while the other regained consciousness in a much shorter period. Neither, however, was able to recall any part of the trip homeward and therefore could not assist the court or jury in placing liability upon the person responsible for the collision. The other two, who suffered severe cranial and bodily injuries and bruises, testified at the trial at considerable length. Their testimony was to the effect that they did not at any time travel at a greater speed than thirty-three miles per hour and drove practically the whole distance on the extreme westerly or slow lane; that upon a practically straight road for a distance of about one-half of a mile before the accident occurred they noticed a Chevrolet car ahead of them. They slowly encroached upon said car, traveling up grade, and when within twenty or thirty feet of it it suddenly slowed up and swerved to the left. At this juncture the occupants of the Buick sedan, who for the first time saw said truck and trailer parked immediately in the slow lane directly in their path, attempted to avoid a collision by swinging to the left, the right front corner of the sedan striking the left rear corner of the trailer in such a manner as to cause it to telescope with the trailer. The front portion of the sedan was badly demolished and all the occupants thereof received injuries such as have already been briefly adverted to. The Chevrolet car, which respondents had been following for some distance barely missed the outer left side of the trailer.

The testimony is absolutely conflicting in several material matters. It is the settled rule that where the evidence is in substantial conflict the discretion imposed in the trial court to make its order granting a new trial upon the grounds of the insufficiency of the evidence will not be made the subject of review upon appeal. (*Lauchere* v. *Lambert,* 210 Cal. 274 [291 Pac. 412].) Only reference to the evidence contained in the record which tends to support the action of the trial court, which had the further advantage of observing

the witnesses and taking notice of various matters which occur during the trial of causes which cannot be reproduced upon appeal, will be given brief mention. It is for the reason above suggested that wide discretion is reposed in trial courts in granting new trials, which has been many times expressed in the decisions of courts generally. All inferences and testimony which may be reasonably construed to sustain the court's action must be indulged in favor of its order.

There is nothing inherently improbable in the testimony of the driver of the sedan and his companion who sat by his side. All of the occupants of the sedan were men past middle life and there is no intimation that their personal conduct was open to criticism. The testimony of the two who were able to recall the events leading up to the collision was that the night was a "little foggy and misty" and Mr. Dioze, the driver, had both of his windshield wipers in action; that a moment before the car preceding them turned out of the slow lane it slackened its speed and the sedan was then within fifteen or twenty feet from the out-turning car. They then realized their situation, but the driver was unable to swing his car entirely free of the trailer. Their testimony is to the effect that there were no lights on the trailer or truck, and there was no one at or near the truck or trailer to warn travelers in any way of the road obstruction. Some five minutes thereafter two young men riding in a passing Ford car came to the rescue and assisted in caring for the injured and conveyed them to the hospital. The testimony of said parties is that it was at least ten minutes from the time the collision occurred until the driver or anyone else connected with the truck appeared on the scene. A witness called by the defense testified that no car preceded the sedan past the stalled truck. The driver of the company's truck testified that he and the Spanish boy were standing with searchlights on the highway north of the trailer, one at a distance of thirty feet from its rear and the other fifty feet distant therefrom and that the driver of the sedan passed him and the Spanish boy, both of whom were waving searchlights as flares and shouting warnings at the driver as he sped by them at a rate of speed of fifty-five miles per hour. This, and the truth as to whether or not the Chevrolet car preceded the sedan a moment before the impact, were certainly material matters,

and they can hardly be explained on the theory of honest mistake. The driver of the truck testified that shortly after the truck stalled he went to South San Francisco for mechanical aid and had not returned more than fifteen minutes before the collision occurred. It is the claim of the respondents that neither the driver nor the Spanish boy were on the spot when the accident occurred. Several witnesses were called by appellants, including three traffic officers, who testified that they observed the truck and trailer both before and after the accident and that the trailer bore a tail-light and the truck and trailer carried each two clearance lights; also that the headlights were burning. There is evidence, however, to the contrary. One traffic officer who saw and observed the stalled truck said that he gave the driver and the helper flashlights with instructions to use them as warning signals to the public and urged the necessity of so doing. The respondents contend, whatever may have been the fact as to what was told the driver and said helper, there is nevertheless positive testimony to the effect that neither were at their post when the accident occurred, and therefore no proper regard was given for the safety of the traveling public. The trial judge saw and observed the witnesses and weighed the credibility of each and considered whatever interest anyone may have had in the result of the trial or what ulterior motive, if any, may have prompted the testimony of any witness, which are matters committed exclusively to the sound discretion of the trial court. That the action of the court in granting a new trial upon the record before us should not be set aside by this court is manifest.

It is strenuously contended by appellants that the court was without authority to grant the *nunc pro tunc* order. It is the contention of appellants that the *nunc pro tunc* order as entered was an attempt to correct a judicial error and to make an order that was never in fact made, citing Freeman on Judgments, vol. 1, p. 248; *Egan* v. *Egan*, 90 Cal. 15 [27 Pac. 22]; 42 C. J., p. 532. The making of said order came about in this way: In due time plaintiffs served notice of intention to move for new trials upon all the statutory grounds, including insufficiency of the evidence to justify the verdict. The motion was heard on June 5th and submitted. On July 3d the judge of the trial court wrote on a paper entitled

"Submission Tag" the following words: "New trial before another court granted." On the same day the clerk of the court wrote out the usual formal entry which concluded in these words: "It is ordered that a new trial in the above entitled actions before another court be and the same is hereby granted." On July 10th, the appellants served and filed notice of appeal from the order granting new trials. They also took the other requisite steps to prepare the record. On August 14th, without notice to appellants, the judge of the trial court signed a formal order, which, among other things, recited that the respective counsel had argued but only one ground of the motion, to wit: "the insufficiency of the evidence to justify the verdict and the court granted said motion on the ground argued by counsel, and it appearing to the court that the record made by the clerk of said court does not correctly show the order that was in fact intended to be made by the court and that said record discloses that the entry on the minutes does not correctly give what was the order of the court; it is hereby ordered that the order granting said motion be and the same is hereby amended *nunc pro tunc*, reading, 'New trial before another court granted on the ground of insufficiency of the evidence to justify the verdict.' " On August 17th defendants served a notice of motion to vacate the order last mentioned. At the hearing an affidavit made by Robert L. Lamb was presented, in which the points are stressed that the memorandum made on the submission slip and dated July 3d is shown to have been made and signed by the trial judge, and said judge stated that it did not include matters which it should have included and which were in the mind of the court when the memorandum was made. The motion to vacate the *nunc pro tunc* order was denied.

All courts have the inherent power to correct their records so they shall conform to the facts and speak the truth, and that right is not suspended by an appeal from the order nor because the record itself does not show that the entry was incorrect. In the instant case the question involved was whether or not a motion for a new trial assigning all the statutory grounds as its basis should be granted. The court was of the opinion that it should be granted and in passing upon the matter it inadvertently omitted to state the par-

ticular *ground* on which it was granted, which was in truth the only ground urged in the presentation of the motion. The facts and circumstances in which the order was made in the instant case are radically different in substance from the situation presented in *Drinkhouse* v. *Van Ness*, 202 Cal. 359 [260 Pac. 869]. There a change was made as to the parties. A number of complications as to judgments existed which are not in the instant case.  ▮  No case will be found in this state which directly holds that a court may not under the circumstances of the instant case cause to be entered a *nunc pro tunc* order. No substantial reason can exist for the enforcement of a rule which has the effect of preventing a consideration of the sufficiency of the evidence to justify a verdict where it appears that an inadvertence has been committed and the opposing party would suffer no substantial injury from a relaxation of said rule. Such a holding would have the effect of stripping *nunc pro tunc* orders of much of their usefulness.

We are of the view that the rule which should govern the situation before us is well expressed in *King* v. *Emerson*, 110 Cal. App. 414 [288 Pac. 1099, 294 Pac. 768], in which the very question presented here was under consideration. It was said:

"Independent of statutory provisions the court has power on its own motion to correct mistakes in its proceedings, and to annul within a reasonable time orders and judgments inadvertently made. (*Robson* v. *Superior Court*, 171 Cal. 588 [154 Pac. 8]; *People* v. *Curtis*, 113 Cal. 68 [45 Pac. 180].) Ruling[s] and even judgments inadvertently made are not the result of judgment but of oversight, neglect or accident and are subject to correction by the court making them. (*Wiggin* v. *Superior Court*, 68 Cal. 398 [9 Pac. 646]; *Stewart* v. *Taylor*, 68 Cal. 5 [8 Pac. 605].)"

The order in this case, as pointed out in many of the cases dealing with this precise question, did not affect any substantial rights of the appellants. Such orders are not hedged about with the same inflexible rigidity as are judgments which foreclose the final right of the parties litigant. There is no material difference in the force or effect of an order given by written memorandum and one given in open court.  ▮
"Whether a *nunc pro tunc* order should be made depends on

the circumstances of the particular case and it is to be granted or refused as justice may require.'' (42 C. J., p. 532, citing cases.)

The orders are affirmed.

Waste, C. J., Langdon, J., Preston, J., Shenk, J., and Thompson, J., concurred.