[Civ. No. 11166. First Appellate District, Division One.—December 30, 1940.]

ELEANOR BAUMAN, a Minor, etc., Respondent, v. THE CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation), Appellant.

John J. O'Toole, City Attorney, and Henry Heidelberg and Edmond P. Bergerot, Deputy City Attorneys, for Appellant.

F. Bert Fernhoff, City Attorney (Oakland), Homer W. Buckley, Assistant City Attorney, J. Kerwin Rooney, Deputy City Attorney, Ray L. Chesebro, City Attorney (Los Angeles), Frederick von Schrader, Assistant City Attorney, and Bourke Jones, Deputy City Attorney, as *Amici Curiae,* on Behalf of Appellant.

J. G. Moser and A. Don Duncan for Respondent.

PETERS, P. J.—Defendant, City and County of San Francisco, appeals from a judgment in favor of plaintiff, and from an order granting plaintiff's motion for a new trial upon the issue of damages alone. The cause has been submitted upon the appellant's opening brief, together with some supplemental authorities, and upon respondent's brief. Appellant has not filed a reply brief, so that many contentions made by respondent in her brief remain unanswered.

The action is one for personal injuries brought by Eleanor Bauman through her parents as her guardians *ad litem.* Eleanor was five years old at the time she was injured. Liability is sought to be imposed upon the defendant city and county under the terms of section 2 of the Public Liability Act (Deering's Gen. Laws, 1937, vol. 2, Act 5619), which reads as follows:

"Counties, municipalities and school districts shall be liable for injuries to persons and property resulting from the dangerous or defective condition of public streets, highways, buildings, grounds, works and property in all cases where the governing or managing board of such county, municipality, school district, or other board, officer or person having

authority to remedy such condition, had knowledge or notice of the defective or dangerous condition of any such street, highway, building, grounds, works or property and failed or neglected, for a reasonable time after acquiring such knowledge or receiving such notice, to remedy such condition or failed and neglected for a reasonable time after acquiring such knowledge or receiving such notice to take such action as may be reasonably necessary to protect the public against such dangerous or defective condition.''

The facts surrounding the accident are not materially in dispute. The accident occurred on May 10, 1938. On that date appellant owned and was operating a public playground called the Visitacion Valley Playground. This playground was one of the smaller playgrounds operated by appellant, being two hundred and eleven feet from east to west, and three hundred and sixty-eight feet from north to south. In the northeast corner of the playground was a small frame building used as an office by the two directors in charge, to store playground equipment, and for the playing of inside games. Running along the northerly end of the playground was a section constructed and intended for the use of small children. It contained a sand box, which had a low wooden railing around it two inches high, slides, teeter-totters, and swings. The balance of the playground was in lawn. There was no wire netting or other protection of any kind between the sand box and other equipment, and the balance of the playground.

On May 10, 1938, at about 3 o'clock in the afternoon, Mrs. Bauman took Eleanor and her younger sister to the playground. She left the two children playing in the sand box. Some time later, some boys began to play baseball with a hard ball in close proximity to the sand box. During the game, shortly after 4 o'clock, one of the fourteen-year old boys hit a line drive outside the foul line. The ball hit Eleanor in the head, fracturing her skull.

The playground in question was under the control of the Recreation Commission, an appointive non-salaried board. The active salaried head of the department is the superintendent, who, at the time of the accident, was Josephine Randall. She had a large staff of assistants to whom various administrative matters were delegated. Raymond Kimball was assistant superintendent, whose duty it was to check the activities of the various playgrounds. To do this prop-

erly he personally visited each of the playgrounds about once a month. In addition, the Commission, through its superintendent and assistant superintendent, supervised the playgrounds including the one here involved, through directors employed by the Commission and placed in charge of individual playgrounds. On May 10, 1938, the Visitacion Valley Playground was under the joint supervision of directors Rita McLaughlin and Garland Hoffman.

This playground had been constructed in 1933. Shortly thereafter, hard ball equipment had been furnished by the Recreation Commission for use at that field. However, the evidence of the appellant shows that oral instructions had been delivered by the supervising officers to various directors in charge of this playground that only small boys should play baseball on this field; that baseball should be restricted to bunting, running and infield play only; that all baseball play should be confined to the south end of the field to prevent a batted or thrown ball from reaching the small children's section; that no competitive hard baseball games should be played on this field. Mr. Hoffman, one of the directors in charge of the field on May 10, 1938, had been working at that field only about a week before the accident. He testified he had received no specific instructions about the Visitacion Valley Playground, concerning the playing of baseball thereon. It was stipulated that had the Superintendent of the Recreation Commission, Josephine Randall, been called as a witness (she being ill at the time of trial) she would have testified that she had notice or knowledge that upon various occasions the above rules had been violated. The assistant superintendent, Raymond Kimball, admitted that prior to the accident he saw the boys using a hard baseball at the playground, and saw baseball bats in the hands of the boys. There is ample evidence in the record to show that, almost from the opening of the playground in 1933 until the time of the accident, hard ball was played at the playground; that the directors in charge knew of this fact and took no steps to prevent it; that hard ball was played at the north end of the playground, and that the directors in charge knew this fact; that Mr. Hoffman and Miss Mc-Laughlin had been standing around while they played hard baseball at the north end of the field; that hard ball had been played at the north end of the field to such an extent that where home plate was customarily located there was a bare

patch in the lawn; that the boys chose up sides and played competitive baseball with a hard ball nearly every night after practice; that no one, including the directors, had ever prevented them from playing with a hard ball at the north end of the playground; that on at least three prior occasions hard balls had been hit into the small children's section; that on one occasion the ball had narrowly missed a small child; that on another occasion an adult witness had been hit on the leg by a hard ball while sitting with her baby in the children's section. This last witness testified she told the director then in charge of the accident and on other occasions complained to the director about hard ball being played in close proximity to the children's section; but that the director did not stop the boys from playing hard ball near the swings and sand box but allowed them to continue to play there. Another adult witness testified that she visited the playground with her small child frequently between 1936 and 1938; that she observed the boys playing hard baseball every day near the swings and sand box; that on many occasions the ball was hit in her direction, and that on one occasion the baby buggy was hit by a hard ball; that she made complaints to those in charge, but, while the directors told the boys to be a little more careful or to move down the playground a little way, that the boys never stopped playing and that the directors never stopped the boys from playing baseball at the north end. Miss McLaughlin, one of the directors in charge of the playground on May 10, 1938, testified that while normally hard ball was limited to the south end of the field, that when that end of the field was wet the youngsters played hard ball at the north end.

The evidence also shows that on May 10, 1938, a class in the fundamentals of baseball was being held on the playground by one ''Spike'' Hennessy, a W.P.A. worker, who had been sent by the Recreation Department to teach the youngsters the fundamentals of baseball. The class had been advertised in advance, and on that day about forty boys received instruction, although but seventeen or eighteen, just about enough to make up two teams, were playing at the time of the accident. Mr. Hennessy had brought his own equipment—bats, balls and gloves—but the bases were playground equipment secured from the supervisor's house. At the time of the accident Miss McLaughlin was inside the supervisor's house in charge of indoor games. Mr. Hoffman

testified that he was on the playground. It should be here added that at least two of the boys then playing testified that they first saw Mr. Hoffman coming from the supervisor's house after the accident. This would seem to cast some doubt on the testimony of Hoffman. He testified that he observed the playing with the hard ball in close proximity to the small children's section; that he discussed the matter with ''Spike'' Hennessy, and that Hennessy told him he could not take his boys down to the lower end of the field because it was wet. Hoffman did not order Hennessy or the boys to desist, or to change their location, but, realizing the danger, started to patrol the small children's section, and ordered the children playing there to go into the supervisor's house to play. He testified that he walked up and down in front of the section at least five times, but at no time did he observe Eleanor playing in the sand box. According to this testimony, he did keep some other small children off the swings, but did not see Eleanor in the sand box.

The appellant urges that the accident occurred either through the negligent act of a W.P.A. worker or of one of appellant's employees; that in either event it is not liable under the Public Liability Act; that the playground was not inherently dangerous or defective; that it had no notice of any inherently dangerous or defective condition, or, if it did, that such condition was not the proximate cause of the injury.

There can be no doubt that, under the terms of the Public Liability Act, the liability of the appellant, if any, must be predicated upon a showing that the playground was dangerous or defective. The elements that must be established by the plaintiff in such an action are well-settled. They are:

(1) That there was in fact a dangerous or defective condition; (2) that the injuries to the plaintiff resulted from that condition; (3) that the board, officer, or person having authority to remedy the condition had notice or knowledge thereof; (4) that, after acquiring such notice or knowledge, such board, officer or person failed, within a reasonable time thereafter, to remedy the condition, or failed, within a reasonable time, to take such action as might be reasonably necessary to protect the public against the dangerous or defective condition. (*Arellano* v. *City of Burbank,* 13 Cal. (2d) 248 [89 Pac. (2d) 113]; *Bosqui* v. *City of San Bernardino,*

2 Cal. (2d) 747 [43 Pac. (2d) 547]; *Nicholson* v. *City of Los Angeles,* 5 Cal. (2d) 361 [54 Pac. (2d) 725]; 9 Cal. Jur. [10-year Supp.] p. 627, sec. 180.)

The first and basic element is that the playground was in fact dangerous or defective. It has frequently been stated that no hard-and-fast rule can be laid down as to what constitutes a dangerous or defective condition, but that each case must depend upon its own state of facts. (*Sandstoe* v. *Atchison, T. & S. F. Ry. Co.,* 28 Cal. App. (2d) 215 [82 Pac. (2d) 216]; *Rafferty* v. *City of Marysville,* 207 Cal. 657 [280 Pac. 118]; *Hook* v. *City of Sacramento,* 118 Cal. App. 547 [5 Pac. (2d) 643]; *Arellano* v. *City of Burbank, supra; George* v. *City of Los Angeles,* 11 Cal. (2d) 303 [79 Pac. (2d) 723].) It is also well-settled that as a general rule it is a question of fact for the jury to determine whether a given set of facts or circumstances creates a dangerous or defective condition. (*Sandstoe* v. *Atchison, T. & S. F. Ry. Co., supra; Norton* v. *City of Pomona,* 5 Cal. (2d) 54 [53 Pac. (2d) 952]; *Barrett* v. *Southern Pac. Co.,* 207 Cal. 154 [277 Pac. 481]; *Gerberich* v. *Southern Calif. Edison Co.,* 5 Cal. (2d) 46 [53 Pac. (2d) 948].)

■ Applying these rules to the facts of the instant case, it is clear that this court cannot hold as a matter of law that the implied finding that the playground was dangerous or defective does not find substantial support in the record. The jury was justified in finding that the playground was dangerous and defective for any of the following reasons: That the playground was rendered dangerous or defective by the negligence of appellant in permitting the playing of hard baseball in dangerous proximity to the sand box; that under the circumstances here existing it was the duty of appellant, if hard baseball was to be permitted to be played in the north end of the field, to erect some barrier for the protection of those playing in the small children's section; or the appellant negligently failed to properly supervise the playground by either failing to prevent the boys from playing hard baseball in dangerous proximity to the small children's section or in negligently failing to keep the small children away from the sand box while hard baseball was being played nearby. ■ There can be no doubt that a dangerous or defective condition can be created by the use or general plan of operation of government operated property, as well as by a structural defect. (*Huff* v. *Compton City Gram-*

*mar School Dist.*, 92 Cal. App. 44 [267 Pac. 918].) The very fact that plaintiff was injured while playing in the sand box, and while using the playground in the usual and ordinary way, is some evidence that a dangerous and defective condition existed. (*Hook* v. *City of Sacramento*, 118 Cal. App. 547 [5 Pac. (2d) 643]; *Adams* v. *Southern Pacific Co.*, 4 Cal. (2d) 731 [53 Pac. (2d) 121].) Under such circumstances it seems clear that the implied finding of the jury that the playground was in a dangerous or defective condition within the meaning of the Public Liability Act finds ample support in the record.

Appellant argues, however, that admitting the existence of a dangerous or defective condition, such condition was not the proximate cause of the accident. This argument is predicated upon the contention that the evidence shows that the accident happened through the negligence of "Spike" Hennessy, a W.P.A. worker, who was using hard ball equipment in a prohibited fashion and in a prohibited part of the playground. This contention is largely based on the testimony of director Hoffman, called as a witness by the plaintiff, that he requested Hennessy to move to the south end of the field, but that Hennessy demurred on the ground that the field was wet, and the testimony that Hennessy furnished his own baseballs and bats. ▮ Appellant cites many cases to the effect that an intervening negligent act of a third person may break the chain of causation. That is undoubtedly the law. However, when there are two separate acts of negligence, the question as to whether the second act breaks the chain of causation, or whether it simply becomes a concurring act with the first, is simply a question of proximate cause. The cases are legion that the question of proximate cause is primarily one of fact for the jury. The negligence of the defendant need not be the sole cause of the injury—as long as it is one of the proximate causes, the mere fact that such negligence concurs with that of an independent actor does not break the chain of causation. (*Newman* v. *Steuernagel*, 132 Cal. App. 417 [22 Pac. (2d) 780]; *Hartford* v. *Pacific Motor T. Co.*, 16 Cal. App. (2d) 378 [60 Pac. (2d) 476]; *Gerberich* v. *Southern Calif. Edison Co.*, 5 Cal. (2d) 46 [53 Pac. (2d) 948].) That this doctrine applies where the negligent act of a third person concurs with a dangerous or defective condition created by a city in causing an injury, so as to impose liability on the city

under the Public Liability Act, was expressly held in *Bosqui* v. *City of San Bernardino,* 2 Cal. (2d) 747 [43 Pac. (2d) 547].) In that case the Supreme Court stated at page 764:

"The defendant City suggests that the Public Liability Act does not apply where the defective condition of the street or highway concurs with some other efficient cause or act of a third person to cause the injury. It is urged that a strict construction of the statute leads to this conclusion. The question is apparently new in this state. A few decisions from other jurisdictions support this view. See *Grenier* v. *Town of Glastonbury,* 118 Conn. 477 [173 Atl. 160]. Other courts hold the city liable in such a case. See *Beebe* v. *Scotts Bluff County,* 92 Neb. 501 [138 N. W. 737]; David, Municipal Liability in Tort in California, 7 So. Cal. Law Rev. 372, 440. In our opinion, where the thing exists which is denounced by the statute, namely, the neglect to remedy a dangerous or defective condition after knowledge thereof, and it proximately causes the injury, the City is liable under the clear meaning of the law despite the existence of another and concurring cause".

When these rules are applied to the facts here involved there can be little doubt that the implied finding of the jury that the negligence of the city was one of the proximate causes of the injury is amply sustained.

The testimony of some of the boys who were engaged in the game contradicts that of Hoffman in regard to whether he asked Hennessy to move. They testified they did not see Hoffman on the field or around the small children's section until after the accident, and then observed him coming from the supervisor's house. Moreover, the evidence of Kimball and Hoffman and others is to the effect that Hoffman and Miss McLaughlin were then in charge of all activities on the playground. It is a fair inference from the evidence that these directors had the right to control the activities of Hennessy while he was on the playground. At any rate, there is no doubt that it was within the power and it was the duty of Hoffman to control the boys playing on the playground. Hoffman did not order the boys to go to the south end of the field nor did he order the boys to stop playing at the north end of the field. The evidence is overwhelming that playing with a hard ball at the north end of the field was a common practice, well known to the directors in charge.

There can be little doubt but that the implied finding of the jury that the third element necessary to fasten liability on the appellant—that the board, officer, or person having authority to remedy the dangerous or defective condition had knowledge or notice thereof—finds ample support in the record. ■ It is settled that notice to a mere employee is not sufficient. (*Watson* v. *City of Alameda,* 219 Cal. 331 [26 Pac. (2d) 286]; *Sinclair* v. *City of Pasadena,* 21 Cal. App. (2d) 720 [70 Pac. (2d) 241].) ■ But that is not the status of Hoffman and Miss McLaughlin. They were not mere employees of the Recreation Commission. The evidence shows that the city operates about ninety playgrounds under the control of a nonsalaried board known as the Recreation Commission; that the active head of the commission is the superintendent; that she properly delegated many matters of administration to others; that the superintendent and assistant superintendent supervised the playground here in question through directors employed by the commission and placed in charge of that playground. Although evidence was introduced that the superintendent had orally promulgated rules forbidding hard baseball games at this playground (except bunting, base running, etc.) it was stipulated that had Miss Randall, the superintendent, been called as a witness she would testify that she had notice that the rules had been violated. Moreover, Hoffman was given no instructions at all concerning the playing of hard baseball at this playground. It was admitted that the Recreation Commission had sent hard baseball equipment to that field as early as 1935. The assistant superintendent testified that the director in charge is ''in complete charge of this ground from the time that it is opened until it closes and everything that goes on in that ground.'' There is considerable evidence that hard baseball had been played at the north end of the field for many years, and that the directors in charge knew it, and made no effort to prevent it. As already pointed out, on one prior occasion a woman had been hit with a hard baseball while sitting in the children's section, and, on another, a baby buggy had been hit. On both occasions the mothers had complained to the directors. Kimball, the assistant superintendent, testified that he had observed the boys playing hard baseball at the field. Miss McLaughlin testified that she had observed the boys playing hard baseball at the north end of the field on several occasions.

Under these circumstances it cannot be doubted that a "person having authority to remedy such" dangerous and defective condition, as required by the Public Liability Act, *supra,* had actual notice. The superintendent and assistant superintendent of the commission, and the directors were not mere employees. (*Huff* v. *Compton City Grammar School Dist.,* 92 Cal. App. 44 [267 Pac. 918]; *Hook* v. *City of Sacramento,* 118 Cal. App. 547 [5 Pac. (2d) 643]; *Wise* v. *City of Los Angeles,* 9 Cal. App. (2d) 364 [49 Pac. (2d) 1122, 50 Pac. (2d) 1079].) ■ Even were this not so, it is well-settled that constructive notice is sufficient under this act, and that constructive notice can be shown by the long continued existence of the dangerous or defective condition. (*Edwards* v. *City of San Diego,* 126 Cal. App. 1 [14 Pac. (2d) 119]; *Bridge* v. *Board of Education,* 2 Cal. App. (2d) 398 [38 Pac. (2d) 199].) It is a question of fact for the jury to determine whether the condition complained of has existed for sufficient time to give the public agency constructive notice. (*Edwards* v. *City of San Diego, supra; Wise* v. *City of Los Angeles, supra; Cressey* v. *City of Los Angeles,* 10 Cal. App. (2d) 745 [53 Pac. (2d) 172]; *Hook* v. *City of Sacramento, supra.*)

■ The other element of respondent's cause of action—that those in charge of the playground having authority to remedy the dangerous or defective condition and having notice thereof failed for an unreasonable length of time to remedy the situation or to take such action as was reasonably necessary to protect the respondent against such condition—is amply shown by the evidence. For several years after the superintendent and assistant superintendent and the directors had knowledge as to how the field was being operated, no steps, except verbal orders which they knew were being violated, were taken to protect the small children. ■ Appellant complains of the refusal of the court to admit in evidence testimony to the effect that after the accident the commission prohibited the playing of baseball with hard ball equipment at the playground. Evidence of precautions taken after the accident is not admissible. (*Meyer* v. *San Francisco,* 9 Cal. App. (2d) 361 [49 Pac. (2d) 893].) Certainly, evidence that precautions were taken after the accident in no way shows that the appellant was not negligent in not taking precautions before the accident, after it had knowledge of the dangerous or defective condition. The proffered testi-

mony in fact demonstrates to a certainty the obvious precaution that should have been taken before the accident after the appellant had notice of the defective condition.

Appellant complains of several of the instructions given and several offered by it that were refused. Particular complaint is made of several instructions dealing with the subject of the liability of the municipality for negligence. There can be no doubt that the cause of action created by the Public Liability Act is one predicated upon negligence. While it is true that the municipality is not generally liable for the general negligence of its employees while acting in a governmental capacity, when that negligence comes within the provisions of the Public Liability Act the city is liable. (*George* v. *City of Los Angeles,* 11 Cal. (2d) 303 [79 Pac. (2d) 723]; *Whiteford* v. *Yuba City Union H. S. Dist.,* 117 Cal. App. 462 [4 Pac. (2d) 266]; *Sandstoe* v. *Atchison, T. & S. F. Ry. Co.,* 28 Cal. App. (2d) 215 [82 Pac. (2d) 216].) While an unqualified instruction that the city is liable for the general negligence of its employees would clearly be error, that is not the situation here presented. In the instant case the jury was fully, completely and correctly instructed on the elements necessary to prove a cause of action under the Public Liability Act, *supra.* Under such circumstances no prejudice resulted from two instructions, one defining negligence and the other defining ordinary and reasonable care. In *Arellano* v. *City of Burbank,* 13 Cal. (2d) 248 [89 Pac. (2d) 113], and *Huff* v. *Compton City Grammar School Dist.,* 92 Cal. App. 44 [267 Pac. 918], similar instructions were given and it was held not to constitute reversible error.

Other instructions are complained of as being contradictory and others as improper. We have read the entire charge. Although some of the instructions are not as clear as might be desired, and while several others offered by appellant might well have been given, the charge, when read as a whole, was full, fair and complete. We find no prejudicial error in the instructions.

The only other contention of appellant is that the trial court abused its discretion in granting respondent's motion for a new trial, and in limiting the same to the question of damages alone. The respondent's motion, among other things, specified, as one of the grounds for the motion, ''In-

adequate damages, appearing to have been given under the influence of passion or prejudice; cutting down the recovery to which plaintiff was entitled under the facts" and, as another ground, "Insufficiency of the evidence to justify such an inadequate verdict, and that such inadequate verdict is against law". The order of the trial court reads, in part, as follows: " . . . ordered that the motion for a new trial be granted upon the grounds of insufficiency of evidence to justify verdict—damages insufficient. New trial limited to damages alone".

Appellant contends that the specifications contained in the notice of motion are not sufficient under the rule of *Benjamin* v. *Stewart*, 61 Cal. 605. That case was decided in 1882. Since that date, sections 657 and 659 of the Code of Civil Procedure have been amended several times. The strict requirements formerly existing have been deleted.

While it is true that section 657 of the Code of Civil Procedure does not expressly specify inadequacy of damages as a ground for a new trial, it is now too well-settled for controversy that inadequacy of damages may constitute a ground for granting a new trial under subdivision 6 of that section specifying, "Insufficiency of the evidence to justify the verdict". The cases are collected in 20 Cal. Jur., page 104, section 67.

On the merits of the motion the appellant urges that the evidence supports the $1500 verdict; that every presumption must be indulged in favor of the jury verdict, and against the motion. That is not the law. The presumption on an appeal from an order granting a motion for a new trial is in favor of the order, and the burden is upon the appellant to show affirmatively that the order is erroneous. The granting or denying the motion rests largely in the discretion of the trial judge. Particularly, when the motion is granted on insufficiency of the evidence, the ruling will not be disturbed unless there is a gross, manifest and unmistakable abuse of discretion. These rules are well-settled. (2 Cal. Jur., p. 887, sec. 522; *Ogando* v. *Carquinez G. School Dist.*, 24 Cal. App. (2d) 567 [75 Pac. (2d) 641]; *Laverne* v. *Dold*, 17 Cal. App. (2d) 180 [61 Pac. (2d) 497]; *Carter* v. *J. W. Silver Trucking Co.*, 4 Cal. (2d) 198 [47 Pac. (2d) 733].)

With these elementary rules in mind there can be no doubt that the evidence introduced by respondent supports

the trial court's conclusion that the verdict of $1500 was inadequate. The testimony shows that the child suffered a badly fractured skull. The attending physician testified that after the injury the child was unable to talk and had a paresis of the right side. X-rays showed multiple comminuted depressed fractures of the left frontal parietal region. The child was operated on by a specialist. He testified that he tried to place the fractured pieces of the skull back in their proper position, but that portions of the skull were so shattered they could not be replaced; that the child has two holes in her head covered only by scalp; that these holes will never be closed with bone. Although the child made a good recovery, there is substantial evidence that at the time of trial she still suffered from headaches, that her coordination had been affected, and that she perspires a great deal. Enough has been stated to demonstrate that the evidence supports the action of the trial court.

Appellant also urges that it was error for the trial court to limit the retrial to the issue of damages alone. In its brief it is argued that the question of damages is ''so interwoven with the question of liability that the issues should not be segregated''. The issue of liability is clearly severable from the issue as to the amount of damage. The two issues are in no way connected. Since 1929, section 657 of the Code of Civil Procedure has expressly authorized the trial court in a proper case to grant a new trial on the issue of damages alone. The power was properly exercised in the present case.

The trial court instructed the jury that they were not to award any amount for damages for doctor bills or hospital bills incurred as a result of the injury. If this instruction was error, it may be that it was one of the reasons that moved the court to grant a new trial on the issue of damages. In view of the retrial on this issue the propriety of this instruction should be determined.

During the course of the trial there was offered in evidence doctors' bills totaling $850, and the hospital bill in the sum of $161.67. All bills were made out to the minor. The hospital bill had been paid by the parents, but the doctors' bills were unpaid at the time of trial. The plaintiff had pleaded these items as special damage. The trial court excluded this evidence and gave the above instruction on the

ground that these expenses were chargable to, and payable by, the parents, and could not be recovered by the minor. Both parents were appointed guardians *ad litem.*

The rule has been frequently stated that where the injured child is living with, and is being supported by, the parents, they are primarily responsible for the child's care and maintenance, and for that reason the cause of action to recover such expenses rests with them and not with the injured minor. (*McManus* v. *Arnold Taxi Corp.,* 82 Cal. App. 215 [255 Pac. 755] ; *Durkee* v. *C. P. R. R. Co.,* 56 Cal. 388 [38 Am. Rep. 59] ; *Sullivan* v. *Thompson,* 30 Cal. App. (2d) 675 [87 Pac. (2d) 62].) There is an exhaustive annotation on the subject in 37 A. L. R. 11. But this rule is not without its exceptions. In one case it has been held that, although the parent may recover such items, so may the child, for the reason that the child's estate would be liable for the reasonable value of such services, they being necessities. The rule was applied although the father had, in fact, paid the expenses. (*Aubel* v. *Sosso,* 72 Cal. App. 57 [236 Pac. 319].) All of the California cases recognize that under some circumstances the child may recover these items of expense. Thus, in the McManus case, *supra,* the court stated (p. 224) : "But, as respondent contends, there are certain exceptions to the foregoing rule under which it has been held that the child may recover said expenses, among them being where the child has paid or is legally bound to pay the same (Sutherland on Damages, sec. 1250, note 70) ; or is under guardianship, thereby making his estate legally liable therefor (1 Sedgwick on Damages, sec. 226f ; *Stotler* v. *Chicago & A. Ry. Co.,* 200 Mo. 107 [98 S. W. 509], and in some jurisdictions it has been held that if the parent appears as guardian *ad litem* in an action brought by the child, and includes therein as elements of damages loss of wages and the payment of medical expenses, reimbursement for which under the general rule would accrue to him, he is deemed to have waived the right to recover the same in favor of the child, such waiver operating in the nature of an emancipation and conferring upon the child the right to recover said wages and expenses." In that case, however, the child was not permitted to recover because, under the facts, contributory negligence of the father had been pleaded.

In *Galwey* v. *Pacific Auto Stages, Inc.*, 96 Cal. App. 169, at page 178 [273 Pac. 866], it was held: ''Appellant also objects to an instruction in substance that if the jury found for the plaintiff in damages, then he was also entitled to recover such reasonable expense as he had necessarily incurred for hospital and physicians' services not exceeding the amount alleged in the complaint. It is claimed that the mother of plaintiff was liable for his necessities, including medical attention; that the expense incurred was chargeable to her and could not be recovered in this action.

''It is clear that the mother, who appears to have been the only surviving parent of the plaintiff, was not able to pay the expenses and that she made no promise to do so. The services were necessary in order to save the life of the plaintiff, who would be liable for their reasonable value (Civ. Code, sec. 36). Under the circumstances shown they were recoverable in the present action (*Aubel* v. *Sosso*, 72 Cal. App. 57 [236 Pac. 319]; *McManus* v. *Arnold Taxi Co.*, 82 Cal. App. 215 [255 Pac. 755]).''

In *Finnerty* v. *Cummings*, 132 Cal. App. 48, at page 50 [22 Pac. (2d) 37], the exceptions are stated as follows: ''Ordinarily, that is where the usual relationship of parent and child exists in which the parent exercises his right to the child's services and performs his duty to support it, the right to recover for loss of the child's earnings and for medical expenses incurred in treating its injuries belong to the parent. (*Karr* v. *Parks, supra; Sykes* v. *Lawlor*, 49 Cal. 236; *Durkee* v. *Central Pac. R. Co.*, 56 Cal. 388 [38 Am. Rep. 59]; *McManus* v. *Arnold Taxi Corp.*, 82 Cal. App. 215 [255 Pac. 755].) Where the parent has emancipated the child (*Galwey* v. *Pacific Auto Stages, Inc.*, 96 Cal. App. 169 [273 Pac. 866]), or, as guardian in the child's action, by pleading or testimony, waived his right or estopped himself from subsequently asserting it, the child is permitted to recover these items. (*McManus* v. *Arnold Taxi Corp., supra.*)''

From these cases the following rules can be ascertained. The parents of a minor are normally responsible for medical and hospital care furnished the minor, and the cause of action to recover these items normally rests with the parents. But the child is also liable for the reasonable value of these expenses. Moreover, where the parents bring the action as guardians *ad litem*, and the bills have not been paid, and

these expenses are pleaded, this constitutes a waiver of the parents' rights, and at least where contributory negligence of the parents is not asserted as a defense, the child may properly recover these items. In such case the parents would be estopped from recovering these expenses on their own behalf. Applying these rules to the facts here involved it is our opinion that on the retrial the plaintiff should be permitted to recover the unpaid doctors' bills.

■ One other point should be passed upon. During the direct examination of Dr. Edmond J. Morrissey, the physician who operated upon respondent, he was asked to give his prognosis of the case. He stated that, "The prognosis in this case is good, providing the particular patient does not develop epileptic seizures". When asked if such result was "probable", the trial judge ruled that the doctor could not answer unless he would state that epileptic seizures were "reasonably certain" to occur. The doctor stated that he could not state whether or not this patient was "reasonably certain" to have such seizures; that, "I would not say it was reasonably certain; I would say that it might occur and I would not be surprised if it occurred, but certainly I would not state it was reasonably certain". Thereupon all the doctor's testimony as to future damage was stricken from the record.

The law does not require a doctor to state that future results are "reasonably certain" to occur before his testimony is admissible. ■ Before the jury may allow a recovery for future consequences the evidence must show with reasonable certainty that such consequences will follow, and the jury should be so instructed. The testimony referred to above would not, standing alone, support an award for damages for future consequences. But that does not mean that such evidence was not admissible. The ultimate fact to be determined by the jury is whether it is reasonably certain that future evil consequences will flow from the injury. Any evidence reasonably tending in an appreciable degree to prove that fact is admissible. Its sufficiency to prove that fact is largely for the jury.

The proper limits of such testimony were discussed at length by Judge Shaw in *Cordiner* v. *Los Angeles Traction Co.*, 5 Cal. App. 400 [91 Pac. 436]. There, the doctors did not testify that the evil consequences were "reasonably certain" to occur. After referring at length to the testimony,

the court stated (p. 403) : "To justify a recovery for future consequences the evidence must show with reasonable certainty that such consequences will follow. The fact that in the minds of the jurors the disability indicated may follow, or is likely to or will probably follow as a result of the injury, will not warrant a verdict for damages. This, however, does not mean that the testimony of a witness should be excluded unless he is reasonably certain that the indicated results will follow, nor that isolated portions of his testimony should, standing alone, or considered with other evidence, extend to the degree of strength required to establish reasonable certainty as to future resulting consequences. It is the province of the jury to weigh and determine its value as proof. The evidence here tended, in an appreciable degree, to prove the ultimate fact; that is, the reasonable certainty that future evil consequences would result from the injury, and was properly admitted for the consideration of the jury—it being its function, upon a consideration of the evidence as a whole, to determine its sufficiency as proof of the ultimate fact. Its competency should not be confounded with its sufficiency; nor should the technical definition of words constitute a controlling factor in determining the question of admissibility. But, as stated in *Ballard* v. *Kansas City,* 110 Mo. App. 391, [86 S. W. 479], 'the main object is not to draw fine distinctions based upon accurate definitions or words, but to ascertain the real idea expressed.' (See, also, *Block* v. *Milwaukee St. Ry. Co.,* 89 Wis. 371, [46 Am. St. Rep. 849, [27 L. R. A. 365], 61 N. W. 1101].) It is often impossible to show by positive proof whether or not an impairment of health or faculties will follow as a result of injury. Hence, of necessity, in determining the question courts and juries must rely upon the testimony of properly qualified physicians for such testimony as will in the minds of the jury establish the fact in issue to a reasonable certainty. Such evidence must be clearly distinguished from conjecture, or that which merely establishes a possibility of future trouble. As a rule, the physician whose opinion is most reliable is loath to give an opinion as to what consequences will or will not follow as a result of an injury in a certain case, but at the same time willing, as here, to state the result of his own professional experience and observations in treating cases where like injuries have occurred, and as a result of that experience say

that we might or might not expect like results to follow in this case. Testimony of duly qualified experts which shows that in a majority of cases where the injury consists of a fracture at the base of the brain, such injury results in future epilepsy, paralysis, or mental deterioration, tends to prove the reasonable certainty that such consequences will follow in any given case of like injury.

"In this view considered, the evidence, while it may not have been by the jury considered sufficient proof, nevertheless tended to establish to a reasonable certainty that, notwithstanding the apparent recovery of the plaintiff, she would in the future suffer from the effects of the injury."

Practically the same rule was applied in *Riggs* v. *Gasser Motors*, 22 Cal. App. (2d) 636 [72 Pac. (2d) 172]. In that case, at page 640, the court stated: "On the question of damages and what the jury might consider, the court read to the jury section 3283 of the Civil Code, as follows: 'Damages may be awarded in a judicial proceeding for detriment resulting after the commencement thereof, or certain to result in the future.' Appellants rely upon the fact that no witness testified absolutely that future results were certain to occur, but only gave their opinions as to what might and might not occur. We take it that it is the province of the jury to determine from testimony whether the injuries are such that future detriment is certain to occur, or rather, may be shown by the testimony to be so reasonably certain to occur as to be considered by the jury in determining the damages to be awarded. The fact that a witness may testify that in his opinion a future detriment is certain to occur, does not make it certain that such detriment will occur, any more than a modified opinion or statement that future detriments do occur under like conditions may reasonably be apprehended to occur."

On the retrial the admissibility of evidence on this issue should be governed by these rules.

For the foregoing reasons the judgment and order appealed from should be, and each is, affirmed.

Knight, J., and Ward, J., concurred.