[Sac. No. 4209. In Bank.—July 23, 1929.]

ANNA RAFFERTY, Respondent, v. CITY OF MARYS-VILLE (a Municipal Corporation), Appellant.

W. P. Rich and F. E. Carlin for Appellant.

Charles A. Wetmore, Jr., and Ray Manwell for Respondent.

Wm. J. Locke, City Attorney of Alameda, Jess E. Stephens, City Attorney of Los Angeles, John J. O'Toole, City Attorney of San Francisco, Preston Higgins, City Attorney of Oakland, Hugh B. Bradford, City Attorney of Sacramento, Jos. L. Knowles, Assistant City Attorney of Sacramento, Earl J. Sinclair, City Attorney of Berkeley, Archer Bowden, City Attorney of San Jose, J. Leroy Johnson, City Attorney of Stockton, and Loren A. Butts, City Attorney of Fresno, *Amici Curiae.*

SEAWELL, J.—Respondent was awarded by the court, sitting without a jury, a judgment against appellant, City of Marysville, in the sum of $7,744 and costs of suit on account of personal injuries sustained by her as the result of a fall caused by a dangerous and defective condition of a sidewalk which appellant caused to be constructed and maintained at the southwest corner of the intersection of Tenth and I Streets. Said injuries were inflicted on the first day of May, 1926, and consisted of a fracture of the left ankle above the joint and in the joint, and also a fracture of the olecranon process of the left elbow. As a result of said fall, respondent was confined to her bed for a period of two months and suffered great pain. For several months immediately following the infliction of said injuries she was compelled to use two crutches and has since been unable to walk except with the aid of a crutch. Her injuries are permanent and she will continue to suffer pain.

██ The appeal which is taken from said judgment is supported by city attorneys representing nine municipalities of this state, who appear as *amici curiae*.

The section of the city in which the cause of action has its *situs* was a thinly settled outlying district embracing the intersection of Tenth and I Streets. I Street, which extends in a northerly and southerly direction, is intersected by Tenth Street, which extends in an easterly and westerly course. This intersection and contiguous territory was unimproved prior to October, 1924, at which time the City of Marysville entered into a contract with the Warren Construction Company for the paving of I Street from the north line of Ninth Street to Fourteenth Street. The contract provided that whenever aprons or approaches from sidewalks were damaged in the construction of curbs the contractor would be required to repair the same in a neat and workmanlike manner corresponding with the original apron or approach. The contract called for the construction of curbs and gutters along all of the streets to be improved, but did not provide for the construction of aprons or approaches extending from the top of curbs to the street at any of the intersections to be paved. Prior to said improvement the surface of the sidewalk and street at said intersection was composed of the natural soil, but an apron formed by pipes and other material covered over with dirt raised the street crossing to a level with the sidewalk. In other words, there was no step-down in crossing from the curb of the sidewalk to the street. The work, which was completed and accepted by the city in July, 1925, was left, as claimed by respondent, in a defective and dangerous condition in that the level of the sidewalk at the southwesterly corner of said intersection sharply terminated, leaving a distance from the surface of the curb to the street level of fifteen inches.

Respondent at the time of injury was a woman past fifty-eight years of age and had resided in the city of Marysville for a number of years. She resided several blocks distant from said intersection and was not especially familiar with that section. It has been and is the policy and practice of said city in its street improvement plans to construct aprons at street intersections in such manner as to bring the surface of sidewalks on a level with the

surface of the streets, thus bridging gutters and eliminating step-downs. This system uniformly obtains in the thickly settled parts of the city and the comparatively few intersections which are not aproned are found only in the remote and sparsely settled sections where the improvements are not as complete and pretentious as in the business and important residence districts. No step-off, where the gutter is left open at the intersection, equals one-half the distance of the Tenth and I Street intersection, the highest being but six inches in height. It must be held upon the case presented that the general plan of street construction adopted and approved by long usage of said city is the apron plan, and where an exception is made, as in the instant case, the step-down is six inches, and not fifteen inches without an intervening step as the means of descent from and approach to the sidewalk.

The citizens had become accustomed to said plan of construction. The legislature has removed from the consideration of the case all common law and archaic obstacles that formerly stood in the way of a citizen recovering from a municipality damages for personal injuries suffered from dangerous and defective conditions of public streets, by adopting in 1923 (Stats. 1923, p. 675), the following act from which we quote:

"Section 2. Counties, municipalities and school districts shall be liable for injuries to persons and property resulting from the dangerous or defective condition of public streets, highways, buildings, grounds, works and property in all cases where the governing or managing board of such county, municipality, school district, or other board, officer or person having authority to remedy such condition had knowledge or notice of the defective or dangerous condition of any such street, highway, building, grounds, works or property and failed or neglected, for a reasonable time after acquiring such knowledge or receiving such notice, to remedy such condition or failed and neglected for a reasonable time after acquiring such knowledge or receiving such notice to take such action as may be reasonably necessary to protect the public against such dangerous or defective condition."

Negligence is relative to the time, place and circumstances which bear upon the particular acts under investigation.

Each case must depend upon its own state of facts, and so varying are the factors which contribute to produce a result that no hard-and-fast rule may find practical application in the great majority of cases.

The respondent, who resided nine or ten blocks from the intersection, and her niece, left the former's residence at about the hour of 7:30 P. M., May 1, 1926, to visit a carnival which was being held under license privilege of the city of Marysville on the northwest corner of Tenth and I Streets. Her course was northerly upon reaching I Street. She crossed a number of street intersections in her course, and in every case the sidewalk was level with the street surface until she reached the southwesterly intersection of said Tenth and I Streets. At this point the curb or edge of the sidewalk drops abruptly fifteen inches to the street level. The carnival proper was located on the lot situate at the northwesterly corner of said intersection. A Ferris wheel and a merry-go-round were in operation on said lot and these were lighted by electric lights. The corner was occupied by a "hot dog" stand, which used for illuminating purposes either a gasoline or coal oil torch or flare. On the northeasterly corner a 100-candle power electric light globe was suspended from an arm of a pole at an elevation of twenty feet and seven inches from the ground. The southeasterly corner was also occupied by a "hot dog" stand and was similarly lighted as the other stand above described. There was no light on the southwesterly corner nor upon the lot proper except so much as may have been diffused from the lights above described. The 100-candle power electric light (6.6 amperage) was situated diagonally across the intersection at a distance of 97 feet from the point where the injury occurred, there being no light in the center of said intersection. The electrician called by appellant testified that such a light should light up an area of between 90 and 100 feet, and that the direct light would be directly under the lamp embracing a circle 20 feet in diameter and the diffused light proportionately dimmed as the circle grew in circumference. This estimate would place the limit of the direct rays of the lamp quite a distance from the *situs* of the defective or dangerous spot in the sidewalk. The light that was diffused from the Ferris wheel, merry-go-round

and "hot dog" stands may, from ordinary experience in such matters, be set down as negligible. The testimony, however, as to the light conditions is in sharp conflict. A number of witnesses called for the respondent—especially those who, like her, fell from the curb to the gutter in attempting to cross from the southwesterly corner to the northwesterly corner, where the Ferris wheel and merry-go-round were located—testified that the section was absolutely insufficiently lighted, while others testified that the light was sufficient to enable a person to see the step-off and that the light was generally sufficient for all reasonable purposes. The conflict is substantial. There being nothing in the number, kind and arrangement of the lights which has a tendency to render inherently improbable the testimony of the witnesses who testified to the insufficiency of light, their testimony cannot be discredited by us.

The respondent, who was familiar with the apron system which prevailed in the city of her residence, and had walked many blocks with her niece across streets on which the street and curb were uniformly on a level, arrived at the place of amusement about 8 o'clock P. M. Her niece, who preceded her in attempting to cross over to the carnival corner, almost fell as she stepped from the sidewalk. She attempted to forewarn respondent of the step-off, but before she was able to do so respondent, in attempting to go forward, presuming on the continuation of the sidewalk level, was thrown precipitously to the gutter, and sustained the injuries herein described.

During the carnival week three or four other persons, residents of the city, were thrown from their feet in attempting to cross at the point in question. Joseph N. Whyler, collector for the "Appeal-Democrat," was walking arm in arm with his wife and, as he describes the circumstances, "all of a sudden we stepped off" and his wife fell to her knees. He stated further that the corner was dark. Mrs. May Prindiville also suffered a similar experience. She also testified that the lights did not illuminate said corner. Clarence Dempsey, clerk of the court that tried the action, testified: "I was walking along and saw the carnival across on the lot . . . and as I came to the sidewalk end to go into the street I stepped down there

and it was deeper than I expected and I—well, I fell, is what I did; didn't sustain any injuries." His testimony as to the condition of lights at the corner was that it was "shadowy." The step-off could be seen but "you couldn't see to tell it was as deep as it was." The authorities justifying the admission of this class of evidence are collated in 10 Cal. Jur. 827. (See, also, the recent case of *Gorman* v. *County of Sacramento*, 92 Cal. App. 656 [268 Pac. 1083].)

There can be no doubt as to the city having had notice, actual and constructive, as to the condition of the *locus in quo*, both as to the insufficiency of light and the unusual distance from the sidewalk to the gutter level. It may be stated here that this is not a case, such as is considered in many of the cases cited by appellant, where the improvements being proper in the first instance became dangerous from use or decay. It is a case rather where the work was improperly constructed in the first instance and was rendered more dangerous by the lack of street illumination. It is the admitted fact that the mayor of the city, who was also chairman of the committee on streets and roads, was personally notified by Mrs. Edith Thorsen, who resided on I Street very near the point in question, at the time the work was completed in 1925, that the street was, in her opinion, left in a dangerous condition to pedestrians. Her protest was not heeded. For the second time, just as soon as she learned that the carnival was to be located at the northwesterly corner of Tenth and I Streets, she visited the mayor and the chief of police and again notified both that she regarded the situation as dangerous to pedestrians. This question, however, is further conclusively put to rest by the fact that the city accepted the work and, of course, it will be held to have had notice of the existing condition.

No case has been cited where the distance of the tread from sidewalk to street or from tread to tread in any kind of traffic lane was as great as fifteen inches. No one would expect that a step-off of such a distance would be placed at the end of a paved sidewalk or public place without a sign or warning or without being given the chance of observing it by the use of the sense of sight. That she

exercised the care that was exercised by four or five other persons presumed to be normal, there is no room for doubt. Her testimony as to the manner of her approach is in accord with the conduct of the average person under similar circumstances and does not in anywise depart from what should be expected of the average, reasonable, prudent person. Had the electric globe been suspended from a point at the center of the street instead of the furthermost corner it may have shed sufficient light to have enabled persons to have better seen the step-off or at least judged of its depth. We think we may well take notice of the fact that steps or treads, whether in public places, or stairways in private residences, or upon public sidewalks or other places built for pedestrian purposes, seldom, if ever, exceed seven or eight inches, and the public has become accustomed to approximately such a distance. A misjudgment by the fraction of an inch is sufficient to disturb the physical equilibrium.

The trial court found that a dangerous and defective condition continuously existed at said intersection, by reason of the construction as herein described, since its completion and acceptance by the city July 28, 1925, and that the said city had timely notice thereof; that all street intersections between the said intersection and respondent's residence were provided with aprons extending from the end of the sidewalk to the level of the pavement of the street for the protection of pedestrians; that the street light was insufficient to light up said crossing and thereby apprise respondent of the abrupt step-off, nor was there any sign or warning calculated to apprise her of the fact that said abrupt and precipitous step-off existed at said street crossing. The allegations of appellant's answer as to contributory negligence on the part of respondent are fully disposed of by the findings.

The fundamental principles that a municipality reserves the right to change its street improvement system or program when it is reasonably wise to do so, and that it may ordinarily exercise the powers claimed for it by the appellant and *amici curiae* under the constitutional, statutory or inherent powers which are given it free from the risk of being mulcted in damages for so doing, may, as a

general proposition, be admitted. We are not here dealing with those fundamental principles of law, but have considered the case in the light of the facts upon which it is presented.

*Amicus curiae*, the City of Sacramento, has raised two questions in its brief that were not raised by the appellant at the trial or in its brief on appeal. While it is the rule that this court will not, except in rare cases, consider points made by an appellant for the first time upon appeal in this court, we will, nevertheless, state said points, which are as follows: 1. The statute of 1923 does not apply to a chartered city where municipal affairs are concerned; 2. That the act of 1923 is unconstitutional. ˙If the first point is good, the application of the statute would be indeed limited, as most, if not all, of the important cities of the state in which such damages are sought to be compensated are chartered cities. As a foreword not intended to bind ourselves should the point be regularly raised in the future, we are of the view that it would be an anomalous situation which would bring about a legal embarrassment should we be compelled to hold that a city may avoid the force of a general statute by placing the conclusion upon the doctrine that a city is independent of general laws upon municipal affairs. The question of the safety of public ways seems, so far as we are presently advised, to be a matter of state concern, and the obligation of a city to make its highways reasonably safe for general use cannot be chartered away even though a municipality should attempt to do so. Said act of 1923 is inconsistent with such a conclusion.

 The further objection is that the act of 1923 is invalid for the reason that it contains two subjects, contrary to the provisions of article IV, section 24 of the state constitution. We have considered both objections, but have not been convinced that either ground of objection should prevail even had it been urged at the proper time. The act has been before the District Court of Appeal in *Gorman* v. *County of Sacramento, supra, Huff* v. *Compton City Grammar School Dist.*, 92 Cal. App. 44 [267 Pac. 918], and *Dawson* v. *Tulare Union High School Dist.*, 98 Cal. App. 138 [276 Pac. 424], and in none of those

cases was the constitutionality of the act questioned. It is not necessary to pursue the subject further.

Judgment affirmed.

Preston, J., Waste, C. J., Curtis, J., Langdon, J., and Richards, J., concurred.