[Civ. No. 12733.   Second Dist., Div. Three.   Feb. 26, 1942.]

PANSY M. RIPPE et al., Respondents, v. CITY OF LOS ANGELES (a Municipal Corporation), Appellant.

Ray L. Chesebro, City Attorney, Frederick von Schrader, Assistant City Attorney, and Leonard Husar and Bourke Jones, Deputies City Attorney, for Appellant.

Joe Raycraft and Rufus C. Porter for Respondents.

SCHAUER, P. J.—This is an appeal by the defendant city of Los Angeles from a judgment rendered in favor of three plaintiffs after trial by the court without a jury in an action for wrongful death and for personal injuries arising out of an accident in which an automobile being operated by Budd Rippe, the husband of plaintiff Pansy M. Rippe, during darkness and a heavy fog, passed the southern terminus of Pacific Avenue in San Pedro at a point where there was no guard rail or light and where the curb was concealed by an earthen

fill, placed there by the defendant city, traversed eighty-five to one hundred feet of vacant land, and plunged over an adjacent bluff ninety-five feet high. The accident was found to be the proximate result of a dangerous and defective condition of the highway of which the defendant city, but not the deceased driver, had notice and knowledge. In such accident Mr. Rippe was killed and his two guest-passenger companions, plaintiffs Clarence Comer and Chris Jones, were injured, the plaintiff Comer falling with the automobile and the driver Rippe over the cliff and the plaintiff Jones being thrown from the car after it left the highway but before it fell down the precipice.

Defendant city claims neither an exorbitant award of damages nor any error of law but avails itself of the legal right of appeal, arguing in effect that the evidence was insufficient to support the findings. It states its ''points'' as follows:

''Point I. There was no dangerous or defective condition of the street at the scene of the accident.

''Point II. The dangerous and defective condition found by the court to exist was not the proximate cause of the accident.

''Point III. The evidence fails to show that the City of Los Angeles had notice or knowledge of the dangerous or defective character of the condition complained of.''

In its closing brief appellant splits its Point II and elaborates its position with the direct contention that ''The proximate cause of the accident was the negligence of the driver of the car.''

Appellant's points are devoid of merit.

The record discloses that Pacific Avenue is a main through highway with a concrete paved roadway fifty-six feet in width, running in a northerly and southerly · direction through the San Pedro area of Los Angeles. Near the scene of the accident it slopes downward at a one and one-half per cent grade to its southern terminus which is about eighty-five to one hundred feet from the edge of the Point Fermin Cliffs which at that point are about ninety-five feet above mean sea level. At such terminus it is joined by Paseo del Mar, a street which runs in a general east northeasterly and west southwesterly direction, the joinder being on a curve of about sixty degrees banked slightly lower on the outside than on the inside. The outside (southerly and easterly sides) of this curve had

been marked by a curb and by a white-painted fence approximately three feet six inches in height, but about three years before the accident in question a truck had crashed through the fence and made a gap twenty-eight feet wide of which gap a space of sixteen feet was directly opposite and in line with the westerly sixteen feet of roadway of Pacific Avenue. This condition was allowed to exist for three years, up to the time of the accident. The point sixteen feet east of the west curb line of Pacific (extended) was marked by a utility pole adjacent to the south curb of the curve. From this pole, for a distance of about sixty feet along the curve to the west and across all of the twenty-eight feet of fence gap mentioned above the defendant city had thrown in a dirt fill, approximately curb height, so that the curb itself as stated by a witness "for a distance . . . was just barely visible and then disappeared entirely." This dirt fill on the inner or street side was sloped or banked up about six inches and along the edge was surfaced with oil. At the curb it filled the gutter and made the elevation of the street inside the curb exactly the same as that of the land immediately adjacent to the curb outside the street limits. Aside from "hundreds of dents" from previous accidents the pole was marked only with four dull, corroded aluminum strips. On a post of the fence to the east of the pole were the remains of a red glass reflector which was "broken to smithereens and had been hanging in that condition for months and months."

Northerly from a point one block north of its terminus Pacific Avenue was a white-line-marked four-lane highway but at Shepard Street, one block (123 feet) north of its joinder with Paseo del Mar the white lines, other than the double center line, ended. The double center line, which curved around to join Paseo del Mar, was described as being "worn and dim," and as having been painted six or seven months before the accident. There were no zigzag lines to indicate a turn or intersection. In an area beginning some one hundred fifty feet north of Shepard Street, in the *easterly* of the two traffic lanes on the west side of Pacific Avenue, there were painted, and apparently under favorable conditions dimly visible, the words "CURVE" and "SLOW" and an arrow. The car in which decedent Rippe and plaintiffs Comer and Jones were riding on the fateful occasion was not in such easterly lane but, in accordance with law (Vehicle Code, sec. 525) and caution, was proceeding in the lane next to the right

hand or westerly curb. This lane was not favored with any cautionary device or symbol.

Into this setting, during early morning darkness and a dense fog (at about 5:30 o'clock a. m.) on March 15, 1939, the decedent Budd Rippe, with the plaintiffs Comer and Jones, "trying to creep his way along," at a speed not over twenty miles per hour and perhaps as low as six miles per hour, looking for the intersection of a street he never found, drove his light delivery truck south along Pacific Avenue in his right hand (the westerly) traffic lane of Pacific Avenue. He missed the curve into Paseo del Mar, drove over the curb-high dirt fill, sideswiped the utility pole, his car careened into the somewhat rough ground adjacent to the southerly terminus of the highway and the left wheels sank into a gully or channel running from this point out and generally down grade to the edge of the cliff. The plaintiff Jones was thrown from the car while it was crossing the rough ground but the driver and plaintiff Comer remained in the vehicle, which followed the slope about eighty-five to one hundred feet to the precipice edge and crashed to the beach below. The deceased driver was not familiar with the street conditions at the scene of the accident.

The trial court found on sufficient evidence that "on said date and for a long time prior thereto, said defendant failed to erect or maintain a barricade, fence, barrier, visible curb, or any other object at the south end of the west side of Pacific Avenue, which at night time, ordinarily would indicate to a motorist driving south on the right or west side of Pacific Avenue that there was an end of the street or a material change in its course; that the defendant had fomerly [sic] maintained a white fence across said space, but that the same had been broken down and carried away a long period of time prior to March 15, 1939; that on March 15, 1939, the defendant . . . maintained a white barricade or fence along the curb line on the portion of the curve at the south end of the east half of Pacific Avenue and extending slightly to the west of the extended center line of Pacific Avenue; that on March 15, 1939, there was no street light or warning. light of any kind at 'the south end of Pacific Avenue . . . that the defendant, CITY OF LOS ANGELES, and its proper officers and agents with authority to make necessary improvements and repairs, had knowledge and notice of the dangerous and defective condition existing at the south end of the said Pacific Avenue for a sufficient length of time prior to March

15, 1939, in which to have made all necessary improvements or repairs; that the conditions existing on March 15, 1939, at the south end of Pacific Avenue had existed for a period of three years prior thereto."

In addition to the constructive notice arising from the long continued defective condition of the highway (see *Hook* v. *City of Sacramento* (1931), 118 Cal. App. 547 [5 Pac. (2d) 643]; *Wise* v. *City of Los Angeles* (1935), 9 Cal. App. (2d) 364, 366 [49 Pac. (2d) 1122, 50 Pac. (2d) 1079]; *Cressey* v. *City of Los Angeles* (1935), 10 Cal. App. (2d) 745, 747 [53 Pac. (2d) 172]; *Bauman* v. *San Francisco* (1940), 42 Cal. App. (2d) 144, 157 [108 Pac. (2d) 989]) there was ample evidence that the defendant city had actual knowledge of the conditions. Three members of the city council who were members of the public works committee and two deputy city engineers examined the premises in 1936 or 1937 and the conditions found were reported to the board of public works. A council member who discussed the conditions with the president of the board of public works admitted that the city council in 1936 had received a letter from Mr. Rufus C. Porter, a resident of the district, in which letter it was stated, among other things, with reference to the locality in question, that "I desire to repeat to you again, in as strong language as I can make it, that said corner is a very dangerous one, and is becoming more so from time to time as public travel increases.

"Not one but quite a number of deaths have occurred there, and much property has been destroyed. The city lamp pos*t* located there ha*ve* [sic] been destroyed time and again. The large city electric poles or telephone poles have been broken, and destroyed. Since your committee was here, a city lamp was destroyed, and the numerous scars on the posts there are mute but unanswerable signs of what is constantly happening on that corner . . . I venture to say that there has been a greater loss of life and a greater destruction of property at said corner of Pacific Avenue, Paseo del Mar and Bluff Place within the last five years than has occurred by reason of faulty street crossings, at any half dozens corners of Broadway in the City of Los Angeles in the same length of time." Concerning the matters referred to, the councilman testified that in a conversation with the president of the board of public works, early in 1937, he "called his attention to the letter from Mr. Porter . . . that there was a

needed improvement . . . I told him it was a corner that needed attention. It was in a deplorable condition, and it needed attention.'' While it does not appear that the attention of the council or of the board of public works was specifically directed to the precise portion of the curve, the defective condition of which was responsible for the tragedy involved in this case, it would be unjustifiable for us to hold in the light of all the circumstances depicted in the record that as a matter of law the trial court's findings of notice and knowledge are unsupported.

As a result of Mr. Porter's vigorous demands, extending from 1935 to 1937, it appears that the defendant city finally improved to some extent the conditions at the junction involved, so far as the south*easterly* corner thereof was concerned but left the south*westerly* side subject to the defective conditions which existed on March 15, 1939. The words ''slow,'' ''curve'' and the arrow were painted in the easterly roadway north of Shepard Street but no such warning signs were placed in that portion of the roadway which vehicles obeying the law (Vehicle Code, sec. 525) traveling south under dark and foggy conditions such as the car in this case encountered would be traversing. Furthermore the dirt fill concealing the curb at the place where it was most needed for the protection of persons traveling under the conditions decedent Rippe encountered was placed there by the defendant city's own responsible agents; and under the circumstances shown, the trial court was justified in finding that defendant had knowledge of this inherently dangerous condition which it created (*Wise* v. *City of Los Angeles* (1935), *supra,* 9 Cal. App. (2d) 364, 367; *Sandstoe* v. *Atchison, T. & S. F. Ry. Co.* (1938), 28 Cal. App. (2d) 215, 219 [82 Pac. (2d) 216]). In this connection it should be noted that the trial judge himself inspected the area and had the benefit of his own observations as of the trial date in interpreting the conditions shown by the photographs and testimony of witnesses to have existed on March 15, 1939, and prior thereto.

It has been repeatedly held in this state that when dealing with cases falling under the provisions of the Public Liability Act of 1923 (Stats. 1923, p. 675; Deering's Gen. Laws, 1937, Act 5619, p. 2630), as does this case, each of such cases must depend upon its own state of facts and that in the majority thereof no hard and fast rule can be applied (*Rafferty* v. *City of Marysville* (1929), 207 Cal. 657, 661 [280 Pac. 118]; *George* v. *City of Los Angeles* (1938), 11 Cal. (2d) 303, 309

[79 Pac. (2d) 723]; *Arellano* v. *City of Burbank* (1939), 13 Cal. (2d) 248, 254-255 [89 Pac. (2d) 113]). ■ As tested by the discussions of the law in the cases cited the evidence in the case before us clearly supports the trial court's conclusions that a dangerous and defective condition of the street existed at the place of the accident and that defendant city had both actual knowledge and constructive notice of such conditions.

■ Likewise the question of contributory negligence of the deceased driver was a problem for the trier of facts. Appellant calls our attention to *Smyth* v. *Harris & Devine* (1934), 3 Cal. App. (2d) 194, 197-198 [38 Pac. (2d) 862], and invokes the doctrine quoted by that case from *Ham* v. *County of Los Angeles* (1920), 46 Cal. App. 148, 158 [189 Pac. 462], which in turn was based on the Wisconsin case of *Lauson* v. *Fond du Lac* (1909), 141 Wis. 57 [123 N. W. 629, 135 Am. St. Rep. 30, 25 L. R. A. (N.S.) 40]. The latter case held flatly that it was negligence on the part of a driver to operate his car at night at such a rate of speed as would prevent the car from being stopped within the radius of illumination of the car lights. It should be noted that the District Court of Appeal in *Sawdey* v. *Producers' Milk Co.* (1930), 107 Cal. App. 467, 472-473 [290 Pac. 684], discussed the Wisconsin case and declined to accept the rule "in all its fullness." We have also examined the cases of *Haynes* v. *Doxie* (1921), 52 Cal. App. 133 [198 Pac. 39]; *Wurl* v. *Watson* (1924), 67 Cal. App. 625, 630 [228 Pac. 43]; *Gammon* v. *Wales* (1931), 115 Cal. App. 133 [300 Pac. 988]; and *Smarda* v. *Fruit Growers' Supply Co.* (1934), 1 Cal. App. (2d) 265 [36 Pac. (2d) 701], and have considered the implications of language used therein with respect to a stricter rule of accountability being applicable to a driver whose vehicle contacts obstructions or defects in the highway bed itself rather than placed thereon (*Sawdey* v. *Producers' Milk Co.* (1930), *supra*) or who is not familiar with the road being traversed, but find none of such cases to be conclusive here.

A statement in *Haynes* v. *Doxie* (1921), *supra*, is, however, pertinent. The facts in that case were that the night was dark and rainy, the windshield of the car was wet and fairly hard to see through, the road ran downgrade and was slippery and the car more or less inclined to skid; the driver did not see an unlighted truck in the highway until he was within twenty-five or thirty feet from it and at the rate of speed he

was traveling, eighteen miles per hour, was unable to stop or turn sufficiently to avoid striking it. The court said, at page 136, ''On these facts we are asked to declare it to be the rule that it is negligence for the driver of an automobile to drive on the highway on a dark night at such a rate of speed that he cannot avoid objects after they come within the area lighted by his lights.'' The court then quotes from *Ham* v. *County of Los Angeles* (1920), *supra*, 46 Cal. App. 148, 158 and proceeds: ''The fact that respondent was not able to see, and did not see, the unlighted truck until he was within twenty-five or thirty feet of the same does not fully establish the facts necessary to give appellant the benefit of the rule above stated. Notwithstanding the facts stated, it may also be true that if the truck had been lighted as required by law, plaintiff would have been able to see it and would have seen it, while at a distance great enough to enable him to stop his automobile and avoid the collision.'' Substantially the same statement may be made here. It may be true that if the highway had been properly constructed and maintained the driver could and would have seen the curb, the barrier, the light, the reflector, the lines or cautionary words or symbols in the roadway or adjacent to it in ample time to turn into Paseo del Mar or to stop. The difficulty in this case was that *there was nothing of the sort for the careful driver to see*. The speed of the car was somewhere between six and twenty miles per hour. If we hold that on the facts presented it was negligence *per se* for the driver to proceed it will practically amount to a holding that any vehicular movement whatsoever under such conditions is negligence. It would license municipalities to construct and maintain highways with defects dangerous and concealed under conditions other than those of good visibility. Such a rule would not be in accord with the standards of governmental care, skill, and integrity in public improvements which citizens have a right to expect and for which the users of highways well pay. We cannot even conclude with certainty that any amount of familiarity with the streets in question would have enabled driver Rippe to avoid the disaster he encountered.

■ It should be observed also that the doctrine of negligence in speed at night suggested in the cited cases and sought to be applied here by appellant is predicated on the premise (as stated in the case of *Ham* v. *County of Los Angeles* (1920), *supra,* at page 159) ''if he drives at a rate

of speed which will not permit him to stop or slow up within the radius illuminated by his lights, *and the accident is proximately caused thereby.*'' (Italics added.) The evidence before us does not require a finding that the car at the speed it was traveling could not have been turned safely into Paseo del Mar or even entirely stopped within the radius of its lights if there had been anything for those lights to illuminate reasonably sufficient under the circumstances to warn the driver that the roadway ended or turned. It was the defective and dangerous condition of the highway, unmarked and not readily visible, which was the proximate cause of the accident, not the speed of the car. The dark colored utility pole with four corroded aluminum plates which the side of the car struck was out of the. roadway and striking it no more conclusively proves negligence of the driver than would striking an unlighted vehicle standing in the street. Its presence adjacent to the curb not directly in line with the car's path does not furnish such irresistible proof of negligent speed, manner of operation, or of proximate cause, as to require a conclusion contrary to that reached by the trial court, which under the circumstances is conclusive. (*Van Praag* v. *Gale* (1895), 107 Cal. 438, 444 [40 Pac. 555] ; *Arellano* v. *City of Burbank* (1939), *supra*, 13 Cal. (2d) 248, 257.)

While it seems at first thought strange that decedent's automobile should have traversed the somewhat rough terrain between the end of the highway and the edge of the bluff for a distance of approximately one hundred feet without his having been able to stop it, we cannot hold, merely because it seems strange, that it was impossible or that it irresistibly imports a foreign link in the chain of proximate cause. The evidence supports the finding that prior to and at the time of leaving the roadway and striking the pole at the obscured curb the decedent had been driving carefully ; it would be unnatural to assume that he saw the conditions and deliberately directed his car away from the highway and across the rough land ; it is more reasonable to infer that the sideswiping of the pole and the lurching of the vehicle from that impact and its own impetus and the careening which the rough ground would produce wrenched the controls from his grasp. The plaintiff Jones was thrown out by the violence of the motion and the car ''seemed to gain new life.'' The very roughness of the ground (as depicted by photographs in evidence) over which the car passed *without overturning* suggests to us not a high

rate of speed or negligent operation as contended by appellant but rather a moderate speed and a reasonable explanation for the failure of the driver at such speed to regain control. His foot might easily have been jolted from brake or clutch, at least momentarily, to accelerator; it was shown that the left wheels followed a gully or channel which apparently was sufficient to guide the vehicle to its disaster, and the slope of the land became sharper as it neared the brink.

The matters recited and other circumstances which we need not enumerate all unite in supporting the conclusion that it was the defective condition of the highway within its own boundaries which was the proximate cause of the death and the injuries suffered; the concealed curb, the dirt fill inside the curb to the same level with the ground beyond the twenty-eight-foot-wide gap in the white fence, the absence of any barrier, light, or other visible marker at the danger point, the termination of the westerly lane white line one hundred twenty-three feet north of the street end or curve, the dimness of the double center line, the absence of zigzag or other lines or markers on the westerly side of the street adjacent to its end or curve into Paseo del Mar, the grade of the street; all of these items were proper for the consideration of the trial judge. Such facts as that the dirt fill was banked up about six inches inside the street, that the utility pole was opposite a point about sixteen feet east of the west curb line extended, that on the pole were four aluminum plates (dull and corroded, but markers of a sort) do not sweep away the force of the contrary circumstances; they but create a conflict of inferences and that conflict has been determined adversely to defendant.

As suggested above the three points urged by appellant in its opening brief and the four as noted in its closing brief, in the final analysis are but an attack on the sufficiency of the evidence. We have surveyed that evidence and find it sufficient. The judgment is affirmed.

Shinn, J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 23, 1942.