[Civ. No. 14275. First Dist., Div. One. Apr. 25, 1950.]

DAIRY BELLE FARMS (a Cooperative Corporation), Respondent, v. A. A. BROCK, as Director of Agriculture, etc., Appellant.

Fred N. Howser, Attorney General, and W. R. Augustine, Deputy Attorney General, for Appellant.

Walter McGovern for Respondent.

Dion R. Holm, City Attorney, and William F. Bourne, Deputy City Attorney, Amici Curiae on behalf of Respondent.

BRAY, J.—The superior court, in a mandate proceeding brought by respondent herein, Dairy Belle Farms, against appellant, the Director of Agriculture, entered judgment directing appellant to set aside his order suspending respondent's milk license for three days, and remanding certain proceedings to the appellant for further consideration. The director appealed.

## Questions Presented

1. Does section 736.13 of the Agricultural Code require a schedule of prices to be on file with the director for a period of five days before an offer may be made to sell dairy products? 2. If so, does the section apply to offers to sell dairy products to the chartered municipality of San Francisco? 3. If so, is the section unconstitutional as an unlawful interference with a purely municipal affair?

## Summary of Proceedings

An accusation was filed with the director charging that respondent had violated the provisions of section 736.13 of the Agricultural Code. After a hearing, the director found respondent guilty of the violation charged, and ordered respondent's distribution license suspended for three days. Respondent thereupon filed a petition for a writ of mandate in the superior court and obtained an alternative writ staying the operation of the order of suspension. Return was made by demurrer and answer. The court overruled the demurrer and proceeded to decide the matter on the facts alleged in the petition and admitted in the answer. It made certain findings which will hereafter be discussed, and then entered judgment vacating the director's order of suspension, and remanding the proceedings to the director ''for further consideration and determination in accordance with the Findings and the opinion of the court . . .'' As stated, the director appealed.

## Facts and Court's Findings

The facts are not disputed. The city and county of San Francisco called for sealed bids for furnishing to it fluid milk, fluid cream and other dairy products for the fiscal year commencing July 1, 1948, said bids to be opened April 23d at 2 p. m. At one minute before 2 p. m. on April 23d, respondent, in accordance with the city charter[1] submitted its sealed bid and at 2:14 p. m. filed a schedule of prices (similar to those in the bid) with the director. The court in the mandate proceeding found that the allegations in the petition that respondent had filed its proposed schedule of prices at the earliest moment possible without violating the requirements of a secret and sealed bid, and that the sealed bid provisions of the San Francisco Charter (under which respondent had filed its bid) prevailed over any conflicting provisions of the Milk Control

[1]Section 89 of the chapter provides: ''All contracts for the purchase of materials, supplies and equipment shall be made after inviting sealed bids by publication.''

Law,[2] were untrue. It further found that respondent filed its bid approximately 15 minutes before it filed its prices with the director; that its offer made in the bid to sell fluid milk and other dairy products was not to be effective until July 1, and "that there was, therefore, no sale at a price not then effective." As conclusions of law the court found (1) that the regulation of the dairy business in the manner prescribed by section 736.13 of the Agricultural Code, is not a municipal affair and that the respondent in dealing with San Francisco is bound by the statute; (2) that section 736.13 does not require the schedule of prices to be on file with the director· for a period of five days before an offer may be made to sell dairy products to the city and county; on the contrary, all that is required is that such schedule be on file at the time an offer to sell is submitted; (3) that filing the schedule of prices 14 minutes after its bid was submitted was a substantial compliance with the requirement that the·schedule be on file at the time of the offer to sell; (4) that the findings upon which the director's order of suspension was based were not supported by the evidence; and (5) that the proceedings should be remanded to the director for further consideration and determination.

## 1. MEANING OF SECTION 736.13.

Probably the first question that should be considered is whether the trial court's interpretation of the section, to the effect that the distributor of fluid milk and cream is not required to file the schedule of prices five days before offering for sale, is correct.

The section reads in part: ". . . Every distributor . . . shall file with the director schedules and any amendments thereto setting forth the prices at which each such distributor is selling or offering or agreeing to sell fluid milk, fluid cream and dairy products . . . Such prices shall not become effective until the fifth day after filing. *Evidence of any sale of, or offer or agreement to sell* such fluid milk, . . . made as part of, or in connection with the sale of, or offer or agreement to sell fluid milk . . . *at less than the prices theretofore filed with the director by such distributor pursuant to the provisions of this section,* shall constitute prima facie proof of a violation of this section." (Emphasis added.)

---

[2]For brevity, we are referring to chapter 13, division 4, formerly chapter 10, division 4, of the Agricultural Code, as the "Milk Control Law."

A mere reading of the above section shows that the schedule of prices must be on file five days before the products are offered for sale. Any other interpretation disregards the underlined portion of said section, and renders completely meaningless "at less than the prices *theretofore filed* with the director by such distributor *pursuant to the provisions of this section* . . ." (Emphasis added.) The history of the section shows that "pursuant to the provisions of this section" can only refer to the requirement that the schedule be filed five days prior to the offer to sell. The first part of the section (not quoted here) provides that no distributor shall sell any fluid milk or fluid cream at less than the prices established by the director under the provisions of the section. Prior to 1941 the section did not have the five-day provision, but provided merely that the director might require distributors to file with him schedules and any amendments thereto setting forth the prices at which such distributor "is selling or offering to sell . . ." In 1941 the section was amended to read as above set forth. Even though now there is no requirement that prices of the excluded products, butter, cheese, etc. (respondent's bid here included cottage cheese), be on file, it is obvious that the section was amended to prevent cutthroat competition in the sale of fluid milk and cream. Apparently the purpose of the amendment was to reach the very situation present in this case.

Even though, in this case, the dairy products were not to be delivered until after July 1, the offer of sale was made the moment the bid was filed. The obvious purpose of the section is to prevent competitive bidding and to permit other distributors to meet the prices filed. The last sentence of the section reads: "Any other distributor in the marketing area may meet any such prices so filed; provided, that such distributor shall file with the director a schedule of prices not exceeding the prices so met by him within 24 hours after meeting the same." If a distributor could sell or offer to sell immediately after his schedule is filed this provision would be useless. The section specifically includes offers and agreements to sell which are conditional.

As the section plainly requires that the schedule of prices be on file with the director five days prior to an offer of sale, it becomes unnecessary to discuss respondent's contention of substantial compliance, as that is based upon the assumption that the five-day provision does not apply.

## 2. Section Applies to Chartered Municipality

Respondent contends, and the brief filed by the city and county of San Francisco as amicus curiae argues, that section 736.13 was not intended by the Legislature to apply to offers to sell dairy products to chartered municipalities, as the Legislature did not intend to invalidate existing charter provisions which required sealed bids by persons offering to sell to the municipalities. This contention, as well as the claimed unconstitutionality of the section, discussed hereafter, were made both to the director and in the trial court, and both found against respondent on both points. Respondent did not appeal, and therefore, contends appellant, this court is precluded from considering respondent's contentions. However, we are more concerned with the correctness of the court's judgment than with the reasons given by the court for its final determination. We have the right to determine if the court's judgment is right and may be sustained upon any theory of law applicable to the case. As said in *Lincoln* v. *Superior Court,* 22 Cal.2d 304, at page 315 [139 P.2d 13], quoting from 2 Cal.Jur. 810, "it is judicial action, and not judicial reasoning or argument, which is the subject of review. [Citations.]" Here the court's findings and conclusions on the interpretation of the section and its applicability, were not findings of fact but conclusions on questions of law.

That the Legislature intended that so far as sales to the municipality of dairy products were concerned, charter provisions for sealed bids were not to apply, appears from the fact that destructive trade practices in selling to a municipality would be as much an evil as selling to any other consumer,—the stabilizing effect of knowledge of ·prices by competing distributors would be lost.

The normal rule of statutory construction is that general words in a statute do not apply to the state or its subdivisions. (*Balthasar* v. *Pacific Elec. Ry. Co.,* 187 Cal. 302, 305, 306 [202 P. 37, 19 A.L.R. 452] ; *Whittaker* v. *County of Tuolumne,* 96 Cal. 100 [30 P. 1016] ; 23 Cal.Jur. 625.) This is the so-called rule of "implied exclusion." (See *Marin Municipal Water Dist.* v. *Chenu,* 188 Cal. 734, 736 [207 P. 251].) However, there are exceptions to this rule. The state and its subdivisions may be included either expressly or "by necessary implication." (*C. J. Kubach Co.* v. *McGuire,* 199 Cal. 215, 217 [248 P. 676].) The Milk Control Law has included chartered municipalities by necessary implication. This is so even though

the Milk Control Law contains penal provisions which have been applied here and are required to be interpreted strictly in favor of the accused distributor. The purpose, intent and policy of the Milk Control Law are set forth in the introductory sections. Section 735 states that the milk industry is a business affected with a public interest and the provisions of the chapter are enacted under the police powers of the state. Subdivision (b) of that section adds that unfair, unjust, destructive and demoralizing trade practices have been carried on which constitute a menace to the health and welfare of the inhabitants of this state; that sanitary regulations alone are insufficient to prevent disturbances in the milk industry which threaten to destroy and seriously impair the future supply of fluid milk; "that it is the policy of this State to promote, foster and encourage the intelligent production and orderly marketing of commodities necessary to its citizens, including milk, and to eliminate speculation, waste, improper marketing, unfair and destructive trade practices, and improper accounting for milk purchased from producers."

Section 735.1 provides: "The purposes of this chapter are to: . . . (d) Enable the dairy industry with the aid of the State to correct existing evils, develop and maintain satisfactory marketing conditions, and bring about a reasonable amount of stability and prosperity in the production and marketing of fluid milk and fluid cream and provide means for carrying on essential educational activities. It is the intent of the Legislature that the powers herein conferred shall be liberally construed. . . ."

Respondent points out that the dairy products which the city purchases are not resold by it but are supplied the inmates of the city hospitals, jails and other institutions, and argues therefrom that section 736.13 should apply only to sales to retailers who propose to resell either directly or in a manufactured form. But such an interpretation overlooks the portion of the section hereinafter italicized: "No distributor shall sell to any retail store, restaurant, confectionery or *other place for consumption on the premises, or to any consumer . . .*"

There has been a contemporaneous construction of the law ever since it was adopted, which shows that it has been interpreted as binding upon the state and its agencies, and upon the city and county of San Francisco. In 1941 the attorney general rendered an opinion to the state purchasing agent to the effect that the act was binding upon the state and its agencies. (Opinion N. S. 3987.) Ever since the law has

existed until the year 1948, the city and county of San Francisco has paid, for milk which it purchased, the prices established by the director under the law. While it has called for sealed bids, it knew in advance that all bids would be identical. The city and county never heretofore questioned the fact that the price it was paying for its milk was fixed by the director. (It does not question now that the bidder must have on file with the director the milk prices at substantially the moment he files his bid with the city, nor that the director may fix the prices at which dairy products are to be sold to it.) Throughout the state since 1941 milk distributors have complied with the law, irrespective of whether the milk was to be sold, or offered for sale, to private persons, cities, counties, the state, or the federal government. The trial court found that in 1947 respondent complied with the law by filing its prices with the director five days before it filed its successful bid with the city. Thus the industry generally and the political subdivisions of the state, as well as the officers charged with its enforcement, have contemporaneously construed the law. As said in *Riley* v. *Forbes,* 193 Cal. 740, 745 [227 P. 768] : " 'A contemporaneous construction by the officers upon whom was imposed the duty of executing those statutes is entitled to great weight; and since it is not clear that that construction was erroneous, it ought not now to be overturned.' "

### 3. The Section as Applied is Constitutional

Respondent and amicus curiae claim that an interpretation which requires distributors desiring to contract with the city and county to file their prices with the director five days before making an offer to sell, and thereby, in effect, nullifying the sealed bid provisions of the city charter as to milk, is unconstitutional as violative of the home rule provisions of the state Constitution. (Art. XI, §§ 6 and 8.) The trial court held quite properly that the regulation of milk is a matter of statewide concern as distinguished from a municipal affair. There can be no question but that a city which has brought itself within the municipal affairs provision of the Constitution has power to enact ordinances relating to municipal affairs which prevail over acts of the Legislature inconsistent therewith. (*West Coast Adver. Co.* v. *San Francisco,* 14 Cal.2d 516 [95 P.2d 138].) As to section 89 of the charter, "Under our constitution, charter provisions have the force and effect of legislative enactments *within their constitutional limitations,* the same being the organic law or local constitution

of the city." (*Dalton* v. *Lelande,* 22 Cal.App. 481, 487 [135 P. 54] ; emphasis added.) Whether the matter of regulating the price of milk in sales to a municipality is a municipal affair or one of statewide concern is a matter of interpretation for the courts. As said in *Butterworth* v. *Boyd,* 12 Cal.2d 140, 147 [82 P.2d 434, 126 A.L.R. 838] : "No exact definition of the term 'municipal affairs' can be formulated, and the courts have made no attempt to do so, but instead have indicated that judicial interpretation is necessary to give it meaning in each controverted case."

"What is strictly a municipal affair is not always easy of determination." (*Horwith* v. *City of Fresno,* 74 Cal.App.2d 443, 446 [168 P.2d 767].) "The rule is that 'any fair, reasonable doubt concerning the existence of the power is resolved by the courts against the [municipal] corporation and the power is denied.' " (*Ex parte Daniels,* 183 Cal. 636, 639 [192 P. 442, 21 A.L.R. 1172].)

█ Although the particular provision under consideration in this case has not been passed upon, the constitutionality of the Milk Control Law has been established. (See *In re Willing,* 12 Cal.2d 591 [86 P.2d 663] ; *Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal.2d 620 [91 P.2d 577] ; *Ray* v. *Parker,* 15 Cal.2d 275 [101 P.2d 665].) The latter two cases deal at length with the policy behind the Milk Control Law. █ That the matters regulated are of statewide concern is shown, at least indirectly, by the following quotation from *In re Willing, supra* (p. 594) : "The purpose of said chapter, as announced in section 735, is to eliminate economic disturbances and unfair trade practices in the milk industry which threaten both the quality and adequacy of the supply of fluid milk and cream. The section declares that health regulations alone are insufficient to prevent disturbances which threaten to destroy and seriously impair the quality and supply of milk. Thus provisions which protect the producer by establishing a fair price to him and affording him security for payment of the price due him for milk and cream by means of a bond, are incident to the broader purpose to protect the public milk supply. Economic security to producers will tend to encourage compliance on their part with sanitary regulations and the maintenance of dairy herds sufficient to provide an adequate milk supply at reasonable prices to consumers.

"The price-fixing provisions are not under attack. But since they are part of the plan to afford a measure of economic security to those engaged in the milk industry in the interest

of protecting the public milk supply, of which plan section 737.5, providing for a bond to secure payment to the producer is another feature, it is pertinent to cite the recent decisions of the United States Supreme Court sustaining statutory provisions for the fixing of milk prices. [Citations.]''

That the ''milk business bears such a relation to the welfare of those dependent upon its use as to be clothed with a public interest'' was held in *Jersey Maid Milk Products Co.* v. *Brock, supra* (13 Cal.2d 620, at page 637), and ''the power to regulate extended to and included the power to fix the price at which milk might be sold.'' (P. 637.)

Generally speaking, the manner of letting purchasing contracts is a municipal affair as to which a home rule charter is superior to general law. However, where, as here, the statute regulating the dairy industry is a matter of statewide concern and conflicts only incidentally with the charter provisions, the statute prevails. Section 736.13, in order to carry out the purpose of the act, applies to all sales whether to municipalities or private persons. It does not conflict with the charter provisions except as to the limited matter of fluid milk and cream.

In *City of Pasadena* v. *Charleville*, 215 Cal. 384 [10 P.2d 745], it was held that the provisions of the Alien Labor Law of 1931 applied to a construction contract awarded by the charter of the city of Pasadena, although generally such contracts were municipal affairs. The language used in the opinion with reference to the public policy involved in the employment of aliens could well be applied to the public policy involved in the control of prices under the Milk Control Law. The court said (pp. 399-400) : ''Reasons of public policy may well be invoked against the employment of aliens on public work, in addition to the mere preferment of citizens. Assuming that the municipality be in position to raise the constitutional question, it would be of no avail and it may not rightly object to the allocation of its funds to citizens for services rendered on public work if, as we hold, such purpose be a matter of general state policy, as distinguished from a municipal affair.''

''Though it is true that the payment of funds of a municipal corporation is a municipal affair because it affects its fiscal policy and management, this does not mean that a state statute concerning a matter of general state concern is not applicable to a charter city. The controlling feature here is

the *manner* in which the state statute affects the municipal affair. If the state statute affects a municipal affair only incidentally in the accomplishment of a proper objective of statewide concern, then the state law applies even as to 'autonomous' charter cities.'' (*Department of Water & Power* v. *Inyo Chem. Co.,* 16 Cal.2d 744, 753-4 [108 P.2d 410].) There the court held that section 710 of the Code of Civil Procedure allowing the garnishment of public moneys was applicable to a charter city. *Wilson* v. *Walters,* 19 Cal.2d 111 [119 P.2d 340], is to the same effect. The same principle was applied in *Polk* v. *City of Los Angeles,* 26 Cal.2d 519 [159 P.2d 931], in holding that the safety rules of the Railroad Commission with reference to maintenance of pole lines applied to a charter city. ''If a state statute affects a municipal affair only incidentally in the accomplishment of a proper objective of state-wide concern, the state law rather than a charter provision controls in home-rule cities. The real test, it seems, is not whether the state or the municipality has an interest in the matter, since usually they both have, but instead whether the state's interest or that of the municipality is paramount.'' (2 McQuillin, Municipal Corporations, 3d ed., p. 152, § 4.87.)

As pointed out in *Wilton* v. *Henkin,* 52 Cal.App.2d 368 [126 P.2d 425], while a municipality has the exclusive right to legislate over its own internal municipal affairs and the state Legislature has exclusive jurisdiction to legislate upon matters which are of state concern, ''there is a field which has been designated as 'not strictly municipal.' '' (P. 372.) The court then held that traffic regulation ''is both a municipal affair, as well as being of concern to the state'' and that in such event the state regulation controls. *Pipoly* v. *Benson,* 20 Cal.2d 366 [125 P.2d 482, 147 A.L.R. 515], is to the same effect with reference to regulation of pedestrian traffic within a city. Thus, in our case, the awarding of contracts is a municipal affair which must give way to the state regulation of a matter of such grave statewide concern as the proper regulation of the milk industry. In *Wilkes* v. *City etc. of San Francisco,* 44 Cal.App.2d 393 [112 P.2d 759], the city claimed that the filing of claims against it for negligence in the maintenance of a street was a purely municipal affair and hence the charter provisions prescribing *where* the claims should be filed prevailed over the general law. In holding that the general law prevailed the court said (p. 397) : ''The existence of liability for defective highways is a matter of general

state concern and 'cannot be chartered away even though a municipality should attempt to do so.' " (See *Helbach* v. *City of Long Beach*, 50 Cal.App.2d 242 [123 P.2d 62]; *Rafferty* v. *City of Marysville*, 207 Cal. 657 [280 P. 118]; *Douglass* v. *City of Los Angeles*, 5 Cal.2d 123 [53 P.2d 353].) If the place of filing a claim against a city is a matter of statewide concern, how much more so is the regulation of the bidding for milk to be supplied a city when the state has adopted a statewide policy of milk price stabilization?

In *In re Means*, 14 Cal.2d 254 [93 P.2d 105], the court held that an ordinance requiring a certificate of registration for journeymen plumbers was invalid as applied to a state civil service employee. Respondent contended that the regulation of plumbing was a municipal affair. The court said (p. 259): ". . . the rule to be applied is not entirely a geographical one. Under certain circumstances, an act relating to property within a city may be of such general concern that local regulation concerning municipal affairs is not applicable." (Citing *Young* v. *Superior Court*, 216 Cal. 512 [15 P.2d 163]; *Civic Center Assn.* v. *Railroad Com.*, 175 Cal. 441 [166 P. 351], and *Key System Transit Co.* v. *City of Oakland*, 124 Cal.App. 733 [13 P.2d 979].) The Means case establishes the principle that there can be municipal affairs which by reason of a general state concern are subject to the general law, and hence are no longer purely municipal affairs.

Respondent cites many cases where it has been held that a particular function is a municipal affair. Some of these are: *Bank* v. *Bell*, 62 Cal.App. 320 [217 P. 538] (a municipal market is a municipal affair); *Los Angeles G. & E. Corp.* v. *Los Angeles*, 188 Cal. 307, 317 [205 P. 125] (sale of electrical energy); *Heilbron* v. *Sumner*, 186 Cal. 648, 650, 651 [200 P. 409] (erecting a dam); *Crowe* v. *Boyle*, 184 Cal. 117, 151 [193 P. 111] (bond issue for viaduct); *Sunset Tel. & Tel. Co.* v. *Pasadena*, 161 Cal. 265, 283 [118 P. 796] (use of streets for telephone poles); *Loop Lumber Co.* v. *Van Loben Sels*, 173 Cal. 228 [159 P. 600] (the letting of a sewer contract by the city and county of San Francisco is a municipal affair precluding the state from requiring materialmen's bonds); *Ex parte Braun*, 141 Cal. 204 [74 P. 780], and *Redwood Theatres* v. *City of Modesto*, 86 Cal.App.2d 907 [196 P.2d 119] (a charter provision for a license tax for revenue is a municipal affair). In none of these cases was there a situation where,

as here, a state statute affected a municipal affair only incidentally, nor where the state's interest was paramount.

The trial court correctly found that respondent in order to contract with the city and county of San Francisco was required to comply with section 736.13 of the Agricultural Code, but incorrectly found that respondent had substantially complied with it and also incorrectly found that the section did not require filing prices five days before making an offer to sell. The court also incorrectly ordered the matter remanded to the director. Respondent had not complied with the statute and therefore the director was justified in finding that he had violated it and in ordering the three-day suspension.

The judgment is reversed.

Peters, P. J., and Schottky, J pro tem., concurred.